# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>JASON CRAIG WILKS,<br><br>Appellant. | No.  50287-9-II<br><br><br>UNPUBLISHED OPINION |

SUTTON, J. — Jason C. Wilks appeals his convictions for one count of second degree child molestation, one count of third degree rape of a child, five counts of third degree child molestation, three counts of unlawful delivery of a controlled substance to a minor with sexual motivation, and five counts of furnishing liquor to a minor with sexual motivation.[1]  Wilks argues that (1) the trial court denied his right to present a defense by preventing him from adducing evidence of the victims' motive to lie about the allegations, (2) the trial court violated Wilks's right to a jury trial by failing to inquire into a juror who was allegedly sleeping, (3) the State committed prosecutorial misconduct during its closing argument, (4) the State presented insufficient evidence to support Wilks's convictions, and (5) cumulative error violated Wilks's right to a fair trial.  In a Statement of Additional Grounds (SAG), Wilks also argues that the trial judge was biased against him.  We disagree with all of Wilks's arguments and affirm his convictions.

---

[1] The charges involved five minor victims.  As a result, we refer to the victims by their initials as opposed to their full names.  *See* RCW 7.69A.030(4).

FACTS

I. BACKGROUND

Wilks was born on September 26, 1978, and later married Katie Wilks.[2]  Together, Katie and Wilks have three children—SW, NW, and JW.  The Wilkses live with Wilks's stepfather, Daniel Herzfeldt.

In 2016, the State charged Wilks with the following crimes committed against five of SW's teenaged friends: two counts of third degree child rape of BS; one count of second degree child molestation of BS; five counts of third degree child molestation of BS, MR, LM, AB, and RR; three counts of unlawful delivery of a controlled substance to a minor to BS, MR, and AB; and five counts of furnishing liquor to a minor to BS, MR, LM, AB, and RR.  During trial, the State argued that Wilks had raped and/or molested the five teenaged girls over the span of two years by getting them drunk and high at his home.  Wilks argued that he had never touched any of the victims inappropriately and had never provided marijuana or alcohol to any minors.  Wilks argued that the allegations were fabricated as retaliation by the girls after Wilks excluded them from his home for bad behavior including sharing inappropriate messages and photographs with his daughter and smoking marijuana.

The jury found Wilks not guilty of one count of third degree child rape but guilty of all other charges.  The jury also found that Wilks committed two of these crimes—unlawful delivery of a controlled substance to a minor and furnishing liquor to a minor—with sexual motivation.

---

[2] Jason, Katie, and their children share a last name.  To avoid confusion, we refer to Katie by her first name and the children by their initials, we intend no disrespect.

## II. EVIDENTIARY RULINGS

During motions in limine, the State and Wilks discussed potential evidence of mental health issues, prior sexual abuse, and prior sex acts of BS and AB. Specifically, Wilks sought to introduce evidence that BS had been molested by her cousin when she was six, engaged in consensual intercourse in the 7th grade, and was raped by a different male in June of 2013. Wilks argued that the evidence would be material to rebut the allegation that BS developed post-traumatic stress disorder (PTSD) as a result of Wilks's actions, to explain BS's precocious sexual knowledge, and to determine whether BS's recollection of incidents with Wilks were actually recollections of the 2013 rape. Wilks also sought to introduce evidence that AB had significant mental health issues prior to the alleged incidents with Wilks. The trial court excluded the evidence of mental health issues, prior sexual abuse, and prior sexual activity.

The State and Wilks also discussed potentially offering testimony about Wilks and Katie excluding the victims from the Wilkses' home because the victims were engaged in promiscuous activity with their daughter. Wilks indicated that his defense theory would be that the victims fabricated the allegations against Wilks in retaliation for being excluded from the Wilkses' home. The trial court ruled that such testimony would need to be ruled on in context as it came up during trial, but that the parties should not use the word "promiscuous." Verbatim Report of Proceedings (VRP) (9-20-16) at 41. The trial court explained:

> I'm not going to prohibit—if it becomes relevant in the course of the trial that Mr. Wilks barred these individuals from their home and the Defense's theory is that the bar from return to his residence precipitated a backlash which was a revenge allegation of these charges, then to some degree I think that it's appropriate to explore that.

3

VRP (9-20-16) at 42. Wilks sought to clarify whether he could present his defense theory during opening arguments. The trial court clarified:

> I think that I need to allow you to say that at one point Mr. Wilks disinvited or barred these individuals from his home and that your theory of the case is that these charges were then leveled after that as an act of revenge. I think that I have to allow that.
>
> But I don't think that I have to allow any of the details about why that all rolled out and what happened until I get a better idea of what the testimony actually is.

VRP (9-20-16) at 43.

The parties also discussed potential testimony about the victims sending and receiving lewd photographs, the discovery of which led Wilks to exclude the victims from his home. The trial court ruled that Wilks could not go into the discrete issue of nude photographs but that he was not barred "from arguing that the conduct and comments and communications related to all of these teenagers became increasing sexualized, and Mr. Wilks, therefore, became concerned and said, 'No more at my house,' and this was retaliation." VRP (9-20-16) at 48.

Later, during a break in Wilks's direct examination of SW, Wilks sought to admit photographs allegedly showing some of the victims displaying promiscuous behavior. Wilks argued that his discovery of the photographs led him to exclude those girls from his home. The trial court ruled that the photographs were inadmissible, concluding that the probative value of any discussion of the victim's promiscuity would be outweighed by the prejudicial effect. The trial court clarified that Wilks could admit evidence that he and Katie had a conflict with the girls, and as a result, the girls were not allowed at the house anymore.

Wilks also sought to elicit testimony from SW that some of the alleged victims were not allowed in Wilks and Katie's bedroom because the girls had stolen from them. Outside the presence of the jury, SW stated:

> [BS] was not allowed in my parents' room because she stole from me and my mom. [MR] was not allowed in my room because of the same thing. She stole from me and my mom. And [LM]—they didn't like [LM] in my room because she's been known to lie, and she's also stole from me and my mom.

VRP (10-27-16) at 136. SW also noted that her parents "just didn't like [RR] in general because there have been multiple incidents with me and her." VRP (10-27-16) at 137. Wilks and the State argued whether SW's further testimony was admissible. The trial court ruled:

> I would observe that 608(b), which we're referring to, states in relevant part that specific acts of conduct in the discretion of the Court, if probative of truthfulness or untruthfulness, may be inquired into on cross-examination of the witness.
>
> This is direct examination, so I just don't see it. I'm not going to allow it.

VRP (10-27-16) at 140.

### III. SLEEPING JUROR

Toward the end of the trial, Wilks informed the trial court that two individuals in the gallery had observed two jurors sleeping during testimony the prior day. Wilks's counsel acknowledged that he did not see any jurors sleeping. The trial court noted:

> I keep a pretty close eye on it. And I can't say to an absolute certainty that one or the other of the jurors may not have had their eyes closed and slept, but I didn't see it. If you see it, you've got to call it to my attention. I can't wake them up from yesterday.

VRP (11-1-16) at 9. Wilks requested to inquire of the jurors if any had fallen asleep during testimony, "out of an abundance of caution." VRP (11-1-16) at 10. The trial court took his request under consideration but did not make a decision.

Later that same day, Wilks informed the court that he had been told the allegedly sleeping juror was Juror no. 10 and that he had allegedly been sleeping that morning as well. The trial court responded:

> So I have been vigilantly watching the jury. I didn't see anyone sleeping. We did get up and stretch. It's a little subjective, but I thought perhaps their attention was starting to fade, and so we got up for a stretch break. I would observe that yesterday—what I have regarding the sleeping incident is I didn't see it. None of my staff saw it. Neither counsel or [sic] any of the Defense or Prosecution team saw it or brought it to the Court's attention. What I have are essentially observations from the gallery. And I don't think that there is cause to inquire of the jurors, you know, whether they were sleeping or not, given the fact that nobody that was directly involved with the case either saw it or brought it to the Court's attention.
>
> I will continue to have breaks or do whatever I can to ensure the attentiveness of the jurors, unless something happens and one of them just tips over and starts snoring. If you see anything, please bring it to my attention in a timely way. That's about all I can do.

VRP (11-1-16) at 47-48. Wilks then requested to inquire with respect to the two individuals from the gallery who allegedly witnessed the sleeping juror; the trial court denied his request.

### IV. TRIAL TESTIMONY

#### A. LM'S[3] TESTIMONY

LM testified as follows. LM met Wilks through SW, who went to middle school with LM. LM went to Wilks's house for the first time sometime between 2011 and 2013 when she was in the 7th or 8th grade. She frequently spent the night at Wilks's home, and when LM was 14 years old and in 9th grade, LM and the Wilks family would drink alcohol and smoke marijuana together. Wilks would provide the alcohol and marijuana, but LM did not smoke marijuana very often. LM had a very close relationship with the Wilks family and came to regard them as a second family.

---

[3] LM was born in June 1999.

On October 22, 2014, LM received a text message from Wilks saying "I'm bored. You need to turn 18 already." VRP (9-27-16) at 43. The following day, LM went to a high school football game with SW. After the game, LM went to Wilks's home where they drank Fireball whiskey and played a drinking game. That night, LM, Wilks, SW, and Katie consumed a half gallon bottle of Fireball whiskey. After drinking the whiskey, LM felt dizzy and wanted to lie down.

At the end of the night the four of them went to Wilks's bedroom to watch a movie. Wilks's bed was against the wall in the corner. LM laid closest to the wall, Wilks was next to her, followed by Katie and SW. LM fell asleep during the movie and then woke up to Wilks softly biting her ear, touching her, cuddling her, and rubbing her buttocks. LM fell back asleep because she "didn't want to know what was going on," and when she woke up in the morning her underwear was down and her pants were pulled up. VRP (9-27-16) at 57. LM's vagina felt wet as if it had been touched. The night after the incident, LM was alone with Wilks in a parking lot when he told her he had a crush on her.

The day after the incident LM told two of her friends what had happened and then told her mom. That week LM also told her counselor. LM and her mom then reported the incident to police. Prior to the incident, Wilks had never told LM that she was not allowed to come to his house.

In November, shortly after LM reported the incident to police, Wilks sent her a text message saying, "I don't know what you're trying to get out of this, but I would appreciate it if you could stop. I don't want to have to call CPS on your family about your mom's meth use, but

we will if that's what it takes." VRP (9-27-16) at 92-93. LM took Wilks's message as him trying to get her to take back her accusations against him.

B.  BS's[4] TESTIMONY

BS testified as follows. BS met Wilks through SW when BS and SW were in middle school. Wilks and Katie would provide alcohol and marijuana, which they grew in their bedroom, to BS and SW whenever BS was at their house. Occasionally, Wilks would rub BS's belly, chest, and thighs while they watched movies on his bed. Sometimes BS would ignore the touching, other times she would tell him to stop or push his arm away.

When BS was in 7th grade during the 2011-2012 school year, Wilks had not yet begun giving her marijuana or alcohol. One night she was lying on her side in Wilks's bed, and Wilks started rubbing her breasts and thighs toward her vagina. At the time, BS did not report the incident. She explained, "I mean I was uncomfortable, but I wasn't really sure that it happened, to be honest. . . . I was falling asleep, and I guess I was just more hoping that it didn't. VRP (9-28-16) at 119. Wilks did similar things on other occasions, but BS could not recall the specific dates.

On multiple other occasions, Wilks would touch BS's butt, vagina, thighs, and inside of her bra. The touching would be both over and under clothing and always occurred in his bed and involved alcohol or marijuana. When she was in the 8th grade, Wilks touched BS's vagina under her clothing and put the tip of his finger inside her vagina before she pushed his hand away. Katie and SW were both asleep in the bed with BS and Wilks at the time of the incident. Wilks tried to

---

[4] BS was born in March 1999.

put his finger in her vagina on other occasions and they usually smoked marijuana before those incidents. Wilks tried to rub against her with his penis.

BS explained that her recall of the incidents was somewhat blurred. She explained:

Well, honestly, because I'm in counseling. And I've been working really hard to put all of this behind me. And a lot of dates and times and everything with how long it's been is—they're all coming together.

It's hard to recall which is when, what happened when, what exactly happened that specific time. I know this happened to me. But, to be honest, my answers are going to be I don't know because I do not want to guess and be wrong.

VRP (9-28-16) at 130. There were frequently times during middle school and high school when she would pass out from drinking or smoking too much at Wilks's home. There were a couple of times when BS would wake up with her pants off or down her legs after having passed out.

In November of 9th grade, police officers came to BS's high school and asked her questions about Wilks. The police officers told her a little bit about LM's allegations against Wilks, but LM had never told her any details. BS and LM were not really friends.

BS's friendship with SW was off and on and "rocky." VRP (10-4-16) at 22. There were times that she and SW did not speak to each other.

During cross-examination, Wilks asked BS if Wilks had cut her off due to BS's behavior at his house and her behavior on Facebook. BS responded:

I don't know whether or not he had cut it off. I know that every time me and [SW] weren't friends, there was something going on between us. I didn't hear anything about him. I had heard something from a friend that went to Washington when I went there saying that he said that I wasn't allowed over there, but that's all.

VRP (10-4-16) at 24.

9

C.  MR's[5] TESTIMONY

MR testified as follows.  MR came to know Wilks through SW, who went to the same school as MR.  SW was MR's best friend, and the two of them would hang out at SW's house, smoke marijuana, and watch movies.  MR considered the Wilkses like her family.  They would smoke marijuana, provided by Wilks, almost every day that she was at the Wilkses' house.  Before MR's 16th birthday, the Wilkses gave her a charm bracelet that cost about $190.  MR only drank alcohol at Wilks's house once.

The night that MR drank alcohol at Wilks's house was the Friday before her 16th birthday in 2014.  Wilks left to buy the alcohol at a liquor store, came back to the house, and everyone played a drinking game.  At some point MR, SW, Wilks, and Katie went to sleep in Wilks's bed.  MR fell asleep between SW and Wilks.  At some point in the night, MR awoke to Wilks with his hand down her pants, touching her vagina.

The morning after the incident, MR disclosed what had happened to her friend.  A few days later, MR messaged Katie and asked her to meet her at a transit center.  At the transit center, MR disclosed the incident to Katie and SW.  About a week later, MR was at Wilks's home when Wilks asked to talk to her on the back porch.  MR recalled, "He was telling me that he had mistaken my body for his wife's body and that I needed to start acting like nothing happened or I can't come over anymore."  VRP (10-5-16) at 33.

In November of 2014, MR disclosed the incident to a school counselor who then reported it to police.

---

[5] MR was born in October 1998.

On cross-examination, Wilks asked MR, "Isn't it true that before everything happened [SW]'s dad cut you off from their residence and [SW] due to your behavior?" VRP (10-5-16) at 58. MR responded that it was not true.

D. AB'S[6] TESTIMONY

AB testified as follows. AB met Wilks at SW's birthday party when AB was a freshman in high school and either 14 or 15 years old. AB met SW through a mutual friend, RR. When AB hung out with SW, they would hang out at Wilks's house, smoking marijuana or drinking alcohol that was provided by Wilks. As AB became better friends with SW, AB became Instagram and Facebook friends with Wilks and Katie. At one point AB posted a picture of herself, and Wilks commented saying she was beautiful.

On the night of Katie's birthday in the summer of 2014, AB went out to dinner with the Wilkses, returned to their house after dinner, and started drinking and smoking marijuana. Katie and Wilks provided the alcohol and marijuana. AB, SW, Katie, and Wilks played a drinking game called "King's Cup." VRP (10-6-16) at 77. Later in the night, AB woke up in Wilks's bed lying between SW and Wilks. Wilks was "running his hands along" her, caressing her, trying to kiss her, and had his hands in her pants touching her vagina. VRP (10-6-16) at 79.

Several months later, AB disclosed the incident to her mother by writing her a letter. AB and her mother then called and reported the incident to the police.

---

[6] AB was born in November 1998.

11

E.     RR'S[7] TESTIMONY

RR testified as follows. RR came to know Wilks through her friendship with SW when she was a freshman in high school during the 2013-2014 school year. When RR was friends with SW she would spend most weekends at SW's house, up until June 17, 2014. While at Wilks's house, they would smoke marijuana, drink alcohol, and hang out. Wilks and Katie would provide the marijuana and alcohol.

One night in February 2014, Wilks gave RR a lot of rum and she became very drunk to the point of blacking out. A few months later RR started having flashbacks and dreams of something that had happened to her that night. In the flashbacks and dreams, Wilks was in the bed with RR with his hand in her pants touching her vagina. RR only had memory of one incident.

RR's flashbacks were originally somewhat vague, and then more little pieces started to come back after she heard MR's and AB's allegations. When RR started having the flashbacks, she talked to AB about it and eventually told her grandma and her counselor. RR could not say for sure if anything improper happened with Wilks, but RR believed it did happen.

F. KATIE WILKS'S TESTIMONY

At trial, Katie testified that SW and BS had a falling out and were not friends from early in 8th grade until the beginning of their freshman year of high school.

Katie recalled that one day she and Wilks discovered LM and SW in the side yard smoking marijuana. Katie explained that she and Wilks both became upset after finding the girls smoking. Katie also testified that she never saw any kids drinking alcohol or smoking marijuana at the

---

[7] RR was born in December 1998.

Wilkses' house except for the time she caught LM and SW smoking and one time she caught another one of SW's friends with a bottle of alcohol.

G. SW'S TESTIMONY

SW testified that she and BS had a falling out between 8th grade summer and the start of 9th grade. SW explained that between 8th and 9th grade her parents cut off her contact with BS. Later, before November of 10th grade, BS started coming over again. SW also testified that around September of 10th grade, she was no longer allowed to have contact with MR. SW recalled that the morning of homecoming, her parents caught her and LM in their side yard while LM was smoking marijuana. SW described her parents as being upset with LM and SW. SW explained that after homecoming she no longer hung out with LM because SW felt like LM was a bad influence on her. SW stated that BS, LM, and MR were upset about not being friends anymore.

SW also testified that BS, MR, and RR were not allowed in Wilks and Katie's bedroom when they were at the Wilkses' house.

H. WILKS'S TESTIMONY

Wilks testified in his defense. Wilks recalled SW and LM's friendship, but struggled to articulate a coherent timeline of events. He testified that during SW's 8th grade year, SW and LM had a fight and stopped communicating for a while. Wilks and Katie were not involved in that conflict but did institute a rule that LM could not have contact with SW. Wilks stated that in the fall of 2013, LM and SW started being friends again.

Later in his testimony, Wilks testified that at the end of SW's 8th grade year, Wilks discovered inappropriate photos on SW's phone from SW's time at LM's house, and as a result, he no longer allowed SW to stay over at LM's house. Wilks then stated that in October 2014, he

found more objectionable material involving LM and that's when he stopped allowing SW to go to LM's house. Wilks then testified that the objectionable material did not trigger any restriction of SW spending time with LM. Wilks recalled that LM was not allowed at their house after homecoming after he and Katie discovered her smoking marijuana in their side yard.

Wilks described his daughter's friendship with BS as "rough and rocky." VRP (10-31-16) at 102. Wilks testified that in September of 2013 or 2014, he discovered severely inappropriate photos and text messages involving BS on SW's phone. Wilks explained that as a result, BS "was immediately removed from our house. She was immediately removed from our family period." VRP (11-1-16) at 35.

Wilks recalled that on more than one occasion in 2013 and 2014, he discovered objectionable material on SW's phone from MR, including text messages, Snapchat photos, Facebook messages, and personal photos that made him and Katie concerned. In November 2014, Wilks and Katie decided SW should have no more contact with MR after Wilks discovered objectionable material on SW's phone.

Wilks also testified that after their camping trip to the ocean in 2014, he discovered inappropriate photos and text messages on SW's phone involving AB. As a result, Wilks and Katie no longer allowed SW to have contact with AB.

ANALYSIS

I. EVIDENCE OF MOTIVE TO LIE

Wilks argues that the trial court denied his right to present a defense by preventing Wilks from adducing evidence of the victims' motive to lie. Wilks also raises this issue in his SAG. However, the record reflects that Wilks was not prevented from developing his defense theory.

Further, the trial court did not abuse its discretion in ruling that some of Wilks's evidence was inadmissible. Accordingly, Wilks's argument fails.

Criminal defendants have a constitutional right to present a defense. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, § 3, 22; *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). However, this right is not absolute; it does not extend to irrelevant or inadmissible evidence. *State v. Blair*, 3 Wn. App. 2d 343, 349, 415 P.3d 1232 (2018). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). "The defendant's right to present a defense is subject to 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Blair*, 3 Wn. App.2d at 350 (quoting *Chambers*, 410 U.S. at 302).

Where a defendant premises an alleged constitutional violation on a trial court's evidentiary ruling, we review for abuse of discretion. *See State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017). "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007).

Wilks does not make any citations to the record in either his brief or his SAG to support his contention that the trial court's "numerous evidentiary rulings" denied his right to present a defense. *See* RAP 10.3(a)(6). As a general argument, Wilks contends "[a]bsent the context for the Wilks' [sic] exclusion of the girls from their residence the jury could not consider whether the alleged victims were credible in their testimony about what happened at the Wilks residence." Br.

of Appellant at 50. Wilks's brief vaguely references (1) LM smoking marijuana at the Wilkses' property, (2) LM stealing from the Wilkses, (3) LM having "objectionable material" on her cell phone, (4) SW noting BS stealing from the Wilkses, (5) AB bringing alcohol to Wilks's house, and (6) MR having "objectionable and 'extremely inappropriate'" texts. Br. of Appellant at 49.

> In his SAG, Wilks argues that he was
>
> not allowed to provide any evidence that talked or portrayed the alleged victims in any negative way. The defense was not allowed to show that the alleged victims were bad influences and all had police records and a history of sex abuse and drug abuse. We were not allowed to prove that all of the alleged victims were all in some sort of counseling well before they made their allegations against me and that they all had trouble with school and the law.

SAG at 4.

Assuming these references identify the evidence Wilks contends was improperly excluded, we hold that Wilks's argument fails because the evidence was either admitted or properly excluded.

The majority of the evidence Wilks references was admitted at trial. Wilks was permitted to question LM about her smoking marijuana at Wilks's property. Wilks also elicited testimony from Katie and SW about catching LM and SW smoking marijuana at the house. Additionally, Wilks testified that LM was not allowed at their house after he and Katie discovered her smoking marijuana in their side yard. RP (11-1-16) 36, 101-02. Wilks also testified about the objectionable material involving LM that he had found on SW's phone. Wilks also testified that he and Katie decided not to allow SW to have further contact with MR after discovering inappropriate content involving MR on SW's phone. We could not find any reference in the nearly 4000 page trial

transcript to any attempt by Wilks to bring in evidence that AB had brought alcohol to the Wilkses' house.

The trial court did rule that testimony from SW that BS and LM had stolen from the Wilkses' residence was inadmissible.[8] However, we hold that the trial court did not abuse its discretion by excluding this evidence pursuant to ER 404(a)(3) and ER 608. ER 404(a)(3) provides that evidence of a witness's character or other wrongs or acts are "not admissible for the purpose of proving action in conformity therewith on a particular occasion" except as provided in ER 607, 608, and 609. ER 608 permits that specific acts of conduct may be inquired into on *cross-examination* of a witness, if probative of truthfulness or untruthfulness. Here, Wilks sought to elicit testimony from SW on *direct examination* that BS, MR, and LM were not permitted in Wilks's bedroom because they had stolen from SW and Katie before. The trial court ruled that the character evidence was inadmissible under ER 608 because Wilks sought to admit it on direct examination. This proper application of the evidentiary rules was not an abuse of discretion.

Additionally, Wilks was able to argue his defense theory to the jury during his closing argument. Wilks argued that the girls "were part or felt part of the family until Mr. Wilks discovered improper texts, until Mr. Wilks discovered improper posts, until Mr. Wilks discovered improper photographs, all of which were troubling, objectionable material contained on his teenager daughter's phone." VRP (11-3-16) at 123. Wilks argued that "these girls retaliated when

---

[8] During motions in limine, the trial court also ruled to prohibit inquiry on direct examination of BS into BS allegedly stealing clothing from the Wilkses' residence. Wilks makes no reference to this ruling anywhere in his brief. We do not address the propriety of that ruling in limine as it is inadequately briefed. RAP 10.3; *State v. C.B.*, 195 Wn. App. 528, 535, 380 P.3d 626 (2016) (holding that we will not review issues which are inadequately briefed).

he began consequences, when he began cutting his daughter off from these kids, when he began disallowing these kids, when he began implementing rules." VRP (11-3-16) at 123.

In sum, the trial court did not abuse its discretion by excluding some of Wilks's evidence. Moreover, the few pieces of evidence that the trial court excluded did not deprive Wilks of his ability to present his defense.

## II. SLEEPING JUROR

Wilks argues that the trial court denied his right to a fair jury trial by failing to inquire into an allegedly sleeping juror.[9] We disagree.

We review a trial court's decision to excuse or retain a juror for abuse of discretion. *State v. Ashcraft*, 71 Wn. App. 444, 461, 859 P.2d 60 (1993). Under RCW 2.36.110, the judge has a duty "to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of . . . inattention . . . or by reason of conduct or practices incompatible with proper and efficient jury service." CrR 6.5 states that "[i]f at any time before submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged." "RCW 2.36.110 and CrR 6.5 place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000).

The test is whether the juror engaged in misconduct. *Jorden*, 103 Wn. App. at 229. "[T]he trial judge has discretion to hear and resolve the misconduct issue in a way that avoids tainting the juror and, thus, avoids creating prejudice against either party." *Jorden*, 103 Wn. App. 229.

---

[9] Wilks reiterates this argument in his SAG. Because we fully address it here, we do not address it a second time in the SAG section.

CrR 6.5 does not require a hearing to verify if a juror is unable to serve. *Jorden*, 103 Wn. App. at 227. In determining whether the juror has engaged in misconduct, the trial judge has "fact-finding discretion." *Jorden*, 103 Wn. App. 229. "As with other factual determinations made by the trial court, we defer to the judge's decision." *Jorden*, 103 Wn. App. 229.

Here, nothing in the record establishes that the juror in question was unfit to serve. The judge noted that neither he, nor anyone from the defense or prosecution, had observed any of the jurors to be sleeping; the unsubstantiated alleged observations came from two members of the gallery. Under those circumstances, the trial judge did not abuse its discretion by ruling that further inquiry was not necessary.

### III. PROSECUTORIAL MISCONDUCT

Wilks argues that the State committed prosecutorial misconduct in its closing argument by misstating the evidence, vouching for the credibility of the State's witnesses, offering its personal opinion of Wilks's guilt, and claiming that justice required a guilty verdict.[10] Wilks also argues that the cumulative effect of the alleged misconduct warrants reversal. We disagree.

To prevail on his prosecutorial misconduct claim, Wilks must demonstrate that in the context of the entire record and trial circumstances, the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To demonstrate prejudice, Wilks must show a substantial likelihood that the improper conduct affected the verdict. *Thorgerson*, 172 Wn.2d at 442–43. Because Wilks did not object to the alleged misconduct at trial, he must also show that any misconduct was so flagrant and ill-intentioned that any resulting

---

[10] Wilks reiterates this argument in his SAG. Because we fully address it here, we do not address it a second time in the SAG section.

prejudice could not have been cured by a jury instruction. *Thorgerson*, 172 Wn.2d at 443. We review a prosecutor's comments at closing in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury. *State v. McKenzie*, 157 Wn.2d 44, 53-54, 134 P.3d 221 (2006). "The State has wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility." *State v. Rodriguez-Perez*, 1 Wn. App.2d 448, 458, 406 P.3d 658 (2017).

A.  MISSTATING THE EVIDENCE

Wilks argues that the State committed prosecutorial misconduct by misstating the evidence. Specifically, Wilks takes issue with the State's statement: "While they were unconscious he would move their bodies, touch their bodies, put his hands in their pants, penetrate their vagina. He would rape them." Br. of Appellant at 10 (quoting VRP (11-3-16) at 43). Wilks suggests that the State's argument was tantamount to arguing that Wilks raped all five of the victims. However, reading the State's statement in context, it is clear that the State was suggesting no such thing. Wilks's argument omits the State's very next statement, "He would molest them." VRP (11-3-16) at 43. The State's argument sought to focus the jury's attention on the various allegations brought out in testimony during trial and was not improper.

Wilks also argues that the State misstated the evidence by asserting that the alleged victims were unconscious. However, the evidence adduced at trial supported the prosecutor's statement. Several of the victims testified that they were asleep, passed out, or "blacked out," when Wilks molested them

Wilks appears to take issue with the State's argument that Wilks purchased an expensive bracelet for LM. However, the State never argued that Wilks purchased an expensive bracelet for

LM.  Rather, it referenced the bracelet Wilks purchased for MR, a fact that was adduced during trial when MR testified that the Wilkses gave her a charm bracelet that cost about $190.  SW also testified that the bracelet cost over $100.  Assuming that Wilks meant to challenge the prosecutor's reference to MR's bracelet, we hold that the State's comment was supported by the record and not improper.

Wilks also argues that the State misstated the evidence by arguing that Daniel Herzfeldt testified that there were piles of girls on Wilks's bed.  Wilks argues that Herzfeldt "said no such thing."  Br. of Appellant at 59.  However, Herzfeldt did testify regarding SW's friends, Wilks, and Katie being on Wilks's bed.

> [State]: . . . you mentioned that sometimes you would look in and they would all be kind of piled up on the bed?
> [Herzfeldt]: Correct, sir.
> . . . .
> [State]: So the only place for these piles of people to be are either on the floor or on the bed; is that right?
> [Herzfeldt]:  Correct, sir.

VRP (10-20-16) at 107-08.  While Herzfeldt did not say "piles of girls" explicitly, Herzfeldt did testify that SW and her friends would be piled on Wilks's bed occasionally, and therefore the State's reference was not improper.

Wilks also argues that the State misstated the evidence by saying NW testified that he saw Wilks and SW's friends drinking in his room on homecoming.  Wilks is correct that NW did not testify that he saw them drinking.  However, the jury was properly instructed that statements made by counsel during trial did not constitute evidence.  We presume that the jury followed its

instructions. *State v. Foster*, 135 Wn.2d 441, 472, 957 P.2d 712 (1998). Consequently, Wilks cannot show that the State's improper statement prejudiced him.

Wilks also argues that the State argued facts not in evidence when it argued that Wilks would take steps to silence the victims when they came forward by threatening to call state officials on their parents. Viewing the State's argument in context, the State was specifically referring to Wilks message to LM after she reported Wilks. The State's statement was supported by the record because LM testified that shortly after she reported the incident to police, Wilks sent her a text message saying, "I don't know what you're trying to get out of this, but I would appreciate it if you could stop. I don't want to have to call CPS on your family about your mom's meth use, but we will if that's what it takes." VRP (9-27-16) at 92-93. Thus, we hold that the State's comment was not improper.

Wilks also argues that "the deputy prosecutor forgot his obligation to seek a fair trial for the defendant when he put in his Power Point presentation that the crimes were committed, that the defendant did it, and that **Justice** Guilty [sic]." Br. of Appellant at 61. However, the contested power point slides did not contain any statements of evidence, let alone misstatements of evidence.[11] Accordingly, Wilks's argument fails.

B. VOUCHING

Wilks also argues that the State improperly vouched for the credibility of its witnesses by arguing that "[t]he only conclusion that [sic] supported by the evidence is that LM, BS, MR, AB,

---

[11] Wilks makes this argument in a list of examples of the State's alleged misstatement of the evidence. To the extent Wilks attempts to make a fair trial argument, he offers no further authority or argument to support his contention. Consequently, his argument is insufficient to merit review. RAP 10.3; *C.B.*, 195 Wn. App. at 535.

and RR are telling the **truth**." Br. of Appellant at 59. "The State has wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility." *Rodriguez-Perez*, 1 Wn. App.2d at 458. The State does not commit misconduct unless it clearly expresses a personal opinion as to the credibility of a witness. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). We hold that the State's comment did not express any personal opinion or constitute improper vouching for the credibility of the witnesses. Rather, the State's argument sought to argue inferences from the evidence that the victims were credible.

C. MATTERS OUTSIDE THE RECORD

Wilks also argues that the State committed prosecutorial misconduct by urging the jury to convict based on matters outside of the evidence when it referenced MR crying during her testimony and LM's demeanor while testifying. As previously mentioned, the State maintains reasonable latitude to argue inferences from the evidence, including inferences of witness credibility. *Rodriguez-Perez*, 1 Wn. App.2d at 458. The State explicitly tied MR's and LM's demeanor on the witness stand to their credibility. We hold that the State's comments were not improper.

D. CUMULATIVE PROSECUTORIAL MISCONDUCT

Wilks also argues that the cumulative effect of the State's misconduct constitutes reversible error warranting a new trial. However, Wilks fails to show that any of the State's comments during closing argument were improper with the exception of the State's statement that NW testified that he saw Wilks drinking with SW's friends on homecoming. And that improper comment was not so flagrant that no instruction or series of instructions can erase its prejudicial effect. *Thorgerson*, 172 Wn.2d at 443. Consequently, Wilks's cumulative error argument fails.

IV. INSUFFICIENT EVIDENCE

Wilks argues that the State presented insufficient evidence to support most of his convictions.[12]

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The State has the burden of proving all of the elements of a crime beyond a reasonable doubt. *Rich*, 184 Wn.2d at 903. When reviewing a claim of insufficient evidence, we ask whether any rational trier of fact could find that all of the crime's essential elements were proven beyond a reasonable doubt. *Rich*, 184 Wn.2d at 903.

We view all the evidence in the light most favorable to the State. *Rich*, 184 Wn.2d at 903. And the defendant admits the truth of the State's evidence and all reasonable inferences that arise therefrom. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265-66, 401 P.3d 19 (2017). Both circumstantial and direct evidence are considered equally reliable. *Cardenas-Flores*, 189 Wn.2d at 266. "We defer to the jury 'on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.'" *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

A. SECOND DEGREE CHILD MOLESTATION

A person commits second degree child molestation when that person has sexual contact with another who is at least 12 years old but less than 14 years old and not married to the

---

[12] In his briefing on insufficient evidence, Wilks lists all of his convictions except count 16: furnishing liquor to a minor to RR. Also, he lists counts 12 and 13: third degree child molestation of AB, and unlawful delivery of a controlled substance to a minor to AB, respectively, but does not provide any argument whatsoever. Accordingly, he does not adequately challenge the sufficiency of these convictions, and we do not consider the issue further. RAP 10.3; *C.B.*, 195 Wn. App. at 535.

perpetrator, and the perpetrator is at least 36 months older than the victim. RCW 9A.44.086. At trial, BS testified that when she was in 7th grade during the 2011-2012 school year, Wilks rubbed her thighs, breasts, and vagina while she lay in his bed. BS's birthday is March 1999, and Wilks's birthday is September 1978.

Wilks's argument centers on BS's credibility. *See* Br. of Appellant 63-64 ("No one saw her push defendant away;" "She did not know when any of these acts occurred;" "BS make [sic] no disclosure until after she had been excluded from the Wilkes [sic] residence"). However, we defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *Andy*, 182 Wn.2d at 303. As such, we hold that Wilks's argument fails.

B.  THIRD DEGREE CHILD RAPE

A person is guilty of third degree child rape when the person has sexual intercourse with another who is at least 14 years old but less than 16 years old and not married to the perpetrator, and the perpetrator is at least 48 months older than the victim. RCW 9A.44.079. BS testified that when she was in the 8th grade during the 2012-2013 school year, Wilks touched her vagina under her clothing and put the tip of his finger inside her vagina before she pushed his hand away.

Wilks argues that BS's testimony was insufficient to support the conviction because she was unsure when the incident occurred. Although BS could not recall specific dates, she testified that she was certain that Wilks put the tip of his finger inside her vagina when she was in 8th grade. This is sufficient to place the incident within the charging period of August 1, 2012 to September 30, 2014. To the extent that Wilks's argument goes to the credibility of BS's testimony, we do not review credibility determinations on appeal. Consequently, we hold that sufficient evidence supports Wilks's conviction for third degree child rape.

C.  THIRD DEGREE CHILD MOLESTATION

Wilks challenges the sufficiency of his convictions for third degree child molestation as to BS, MR, LM, and RR.

A person is guilty of child molestation in the third degree when the person has sexual contact with another who is at least 14 years old but less than 16 years old and not married to the perpetrator and the perpetrator is at least 48 months older than the victim.  RCW 9A.44.089.

BS testified that when she was in 8th and 9th grade Wilks touched her nipples, touched her vagina and butt, and pushed his penis against her.  MR testified that, after spending the evening drinking with Wilks, Katie, and SW, MR woke to Wilks's hand down her pants, touching her vagina.  LM testified that after falling asleep in Wilks's bed, she woke to Wilks softly biting her ear, touch her, cuddling her, and rubbing her buttocks.  LM testified that when she woke up the next morning her underwear was down, her pants were pulled up, and her vagina felt wet as if it had been touched.  RR testified that in the months after getting "black out drunk" on rum with Wilks, she began having flashbacks and nightmares of waking up to Wilks with his hand in her pants touching her vagina.  VRP (10-10-16) 127.  Although RR testified that her memory of the incident was somewhat muddled, she believed it did happen.

Taking all the evidence in the light most favorable to the State, we hold that sufficient evidence supported Wilks's convictions for third degree child molestation.

D.  UNLAWFUL DELIVERY OF A CONTROLLED SUBSTANCE TO A MINOR

Wilks argues that insufficient evidence supported his convictions for unlawful delivery of a controlled substance to a minor based on his alleged delivery of marijuana to BS and MR.  Wilks specifically argues that the evidence did not establish that he provided BS and MR with marijuana during the charging periods of June 1, 2012 to September 30, 2014, and September 1, 2014 to September 20, 2014, respectively.

To prove Wilks was guilty of unlawful delivery of a controlled substance to a minor, the State had to prove that Wilks knowingly delivered marijuana to BS and MR who were both under the age of 18 at the time, and that Wilks was at least three years older than BS and MR.  RCW 69.50.401, .406(2).

BS testified that Wilks provided her marijuana when she was in 8th grade, which was the 2012-2013 school year and fell within the charging period.  MR testified that Wilks provided her marijuana every time she went to his house during her 9th grade year, which included the charging period.

Accordingly, sufficient evidence supported Wilks's convictions for unlawful delivery of a controlled substance.

E.  FURNISHING LIQUOR TO A MINOR

Wilks argues that insufficient evidence supported his convictions for furnishing liquor to a minor based on his providing alcohol to BS, MR, LM, and AB.

To prove that Wilks was guilty of furnishing liquor to a minor, the State had to prove that Wilks sold, gave, or otherwise supplied liquor to BS, MR, LM, and AB, or permitted BS, MR, LM, and AB to consume liquor on his premises.  RCW 66.44.270(1).

27

BS, MR, LM, and AB each testified that Wilks provided them alcohol to drink at his house.[13]

Accordingly, we hold that sufficient evidence supported Wilks's convictions for furnishing liquor to a minor.

## V. CUMULATIVE ERROR

The cumulative error doctrine applies when a trial is affected by several errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). The cumulative error doctrine does not apply when there are no errors or where the errors are few and have little or no effect on the trial's outcome. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

We hold that the combined effect of the few minor errors that occurred at trial did not deny Wilks a fair trial. Consequently, the cumulative error doctrine does not apply.

## SAG

In his SAG, Wilks also argues that the trial judge was biased against him. We disagree.

"'Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing.'" *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674 (1995) (quoting *State v. Ladenberg*, 67 Wn. App. 749, 754–55, 840 P.3d 228 (1992)). "'Due process, the appearance of fairness, and Canon 3(D)(1) of the Code of Judicial Conduct require disqualification

---

[13] Wilks specifically argues that the State failed to establish that Wilks provided BS with alcohol during the charging period. But BS testified that Wilks provided her alcohol when she was in 8th grade, which was within the charging period of June 1, 2012 and September 30, 2014.

of a judge who is biased against a party or whose impartiality may reasonably be questioned.'" *State v. Perala*, 132 Wn. App. 98, 110–11, 130 P.3d 852 (2006) (quoting *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000)). There must be evidence of a judge's actual or potential bias. *Bilal*, 77 Wn. App. at 722.

Here, nothing in the record would lead a reasonably prudent, disinterested observer to conclude that Wilks did not receive a fair, impartial, and neutral hearing.[14] Wilks points to nothing in the record suggesting that the trial judge was actually or potentially biased against him. The trial judge made numerous rulings over the course of the six week trial, both in favor of and against both parties. Absent evidence of a judge's actual or potential bias, disqualification of a judge is not proper. We hold that Wilks's claim fails.

---

[14] Over a month into trial, Wilks made a motion to recuse the trial judge from the trial and/or to dismiss the trial. A copy of the motion is not included in the record on appeal. The trial court denied Wilks's motion, explaining:

> I have not denied anybody the right to cross-examine witnesses, to call whatever witnesses that they believe have relevant evidence. I have made the rulings that I have made on the record. The record will be there for appellate review. The motion is denied.

RP (10-26-16) 10.

Accordingly, we affirm Wilks's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.