IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33110-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| C.B.,[†] | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Carter B., a juvenile,[1] was found guilty of second degree

criminal trespass for his role in his friends' entry into the fenced yard of Melvin Harris,

an African-American, where Carter's friends rang the doorbell, shouted a racist comment

through an open window, and ran away. Carter challenges the disposition, invoking the

common law implied license to approach a residential door, but without addressing the

limitations of the common law license. He also invokes inapplicable United States

constitutional First Amendment case law.

The juvenile court's finding that the boys' behavior exceeded the implied common

law license was supported by substantial evidence and the court did not abuse its

discretion in denying Carter's recusal motion. We affirm.

---

[†] Because the superior court record has been sealed by order of that court, we have
changed the caption, substituting the juvenile's initials for his name. *See* GR 15(g).

[1] "Carter" is a pseudonym. We also substitute pseudonyms for the names of his
juvenile partners in the crime.

FACTS AND PROCEDURAL BACKGROUND

On June 1, 2013, Carter B., then 14 years old, dared his friends, Parker C. and Jared W., to "dingdong ditch" the home of Melvin Harris, an African-American. "Dingdong ditch" is the boys' slang for running up to someone's front door, ringing the doorbell, and running away. When Parker and Jared were reluctant, Carter taunted the two, telling them they were "pussies" if they refused. Report of Proceedings (RP) at 190. When they finally accepted the dare, Carter walked his two friends halfway to the Harris home and pointed it out. On the way, Carter "upped the ante and urged the two boys to yell 'nigger' when they rang the doorbell." Clerk's Papers (CP) at 14.

The Harris property was fenced on all sides. To reach the front porch, one had to walk up the private driveway to an opening in the fence, where a private sidewalk led to the porch. There was no mailbox within the front yard; it was located across the street. Because of prior harassment, the Harris family had installed surveillance cameras, and signs that the property was under video surveillance were posted in the window by the front door.

It was early evening when, after continued hesitation, Parker and Jared finally acted on the dare. Mr. Harris and his wife were in the living room watching television at the time. One of the windows adjacent to their front door was open to circulate air on what was a warm evening. After running up the driveway and through the gate to the front yard, Parker and Jared ran on to the front porch, rang the doorbell, and Jared yelled

2

very loudly, "You fucking nigger, go back to Africa!" RP at 126.

The Harrises' initial reaction was shock and fear. Mr. Harris would later testify that the boys' actions "scared the hell out of" him, and he dropped the glass he was holding. RP at 127. He immediately went outside to see who was responsible and saw three males running away.

The couple's fear quickly turned to indignation. Mr. Harris decided to try to locate the boys involved. Correctly surmising where their escape route would take them, he drove to that area and saw Parker, whom he recognized as one of the culprits. Ultimately, all three boys and some of their parents arrived at the location where Mr. Harris had found Parker and they all talked about what had happened. Parker and Jared initially lied about why they had been at the home, claiming they were there to sell football tickets. When Carter's mother arrived and encountered Mr. Harris questioning the boys, she yelled at him, "Why do you have your big black ass in my neighborhood?" RP at 183-84.

All three boys were charged with second degree criminal trespass. Carter was charged as an accomplice. Parker reached a diversion agreement, did community service, and wrote an essay and a letter of apology to Mr. Harris. Jared was denied diversion and pleaded guilty.

Before trial, Carter's lawyer filed a motion claiming that a diversion agreement had been offered by the diversionary unit and moving to compel it. Under RCW

3

13.40.070(6), Carter—a juvenile first time offender who had been charged with only a misdemeanor—was required to have the complaint against him referred to the diversionary unit, for its consideration whether to offer an agreement. At the hearing on the motion, the juvenile court—the Honorable Douglas Federspiel—took the position that neither the State nor the defense had followed proper procedure. The judge was concerned that the State had not referred the case to the diversionary unit as required and was asking the court to exercise a power that it did not have. He was concerned that the defense was asking him to compel a diversion agreement it claimed had been offered, without any evidence of the offer.

During the course of the hearing on the defense motion, Judge Federspiel made several comments that Carter later contended revealed bias. At one point, he stated:

> Well, I—*I have my personal thoughts about this case.* But I don't have the authority to override a discretionary decision that the legislature gave to a diversionary unit.

RP at 50 (emphasis added). Later, expressing disagreement with the prosecutor's view that the court's supervisory power over the diversionary unit empowered him to recommend against diversion, Judge Federspiel said,

> Well, this process was butchered the whole way through. I am denying the motion to demand that it be deferred. What has to happen is this has to be referred to the diversionary unit. The diversionary unit gets to make a decision. And that decision is within their discretion, granted by our state's legislature.
> *Do I like it? No.* But I am bound to follow the law of the legislature. And, you know, when I see representations that a diversion

4

agreement was offered, I sort of get my dander up, because I don't think it was. I think it was discussed. And I don't think the state followed the process that it should have followed.

    *This is an emotional case.* But just because cases are emotional it does not allow you to bypass the law. No matter how much somebody might want to, the law is here to protect from emotion running rampant over the law.

RP at 51 (emphasis added). After announcing his decision to the lawyers, Judge

Federspiel spoke to Mr. Harris, who was present at the hearing, explained the process,

and added:

    I understand that—I can understand that you might not be happy with the decision that I have made today. *But I want you to know that I'm bound as a judicial officer to follow the law that the legislature's passed and that the governor signed. I don't have the ability to bypass the governor or the legislature in terms of this law no matter what my personal feelings are, or what I think the equities are, sir.*

RP at 53-54 (emphasis added).

Carter's case was referred to the diversionary unit, which rejected a diversion

agreement and referred the case back to the court. The intake officer notifying the court

of the unit's decision explained that it was based on "behaviors displayed before, during,

and after the alleged criminal offense." CP at 182. He also explained that "[t]he alleged

victim has been the subject of continuous long-term anti-social behaviors directed at this

family. The issues at hand go far beyond what occurred on the door-step on the day in

question." *Id.*

After his case was referred back to the court, Carter filed a motion asking Judge

5

Federspiel to recuse himself, arguing that the comments the judge made during the

hearing on the motion to compel diversion revealed bias. The judge denied the motion.

At the conclusion of a bench trial, Judge Federspiel found Carter guilty. Carter

appeals.

## ANALYSIS

Carter makes eight assignments of error. The first seven are related, contending

that some of the trial court's findings of fact are not supported by substantial evidence,

that the findings do not support the conclusion that Carter was an accomplice to a second

degree trespass, and that the trial court erred in entering its disposition order. His

remaining assignment of error is to Judge Federspiel's denial of his recusal motion. We

first address the seven related challenges to the evidence and then turn to the recusal

issue.

I. The evidence was sufficient to support the finding of guilt

*A. Challenged findings of fact and standard of review*

In the opening pages of his brief, Carter assigns error to eight of the juvenile

court's findings of fact. But as the State points out, he does not thereafter address the

challenged findings—or at least doesn't address most of them—in the argument section

of his brief. We will not review issues for which inadequate argument is briefed or only

passing treatment is given. *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970

(2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009). Only the asserted shortcomings of

6

findings 1.6, 1.9[2], and 1.14 are sufficiently briefed to warrant review.

Following a bench trial, we review the findings of fact for substantial evidence. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *Id.* at 106. We defer to the trial court, as finder of fact, for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence. *See id.* The trial court entered findings that it found Mr. Harris, Ms. Harris, and Parker, all of whom testified for the State, to be credible witnesses. It found that Jared, who was called by the defense, was not credible.

Carter argues that finding 1.6 is "directly contrary to the testimony at trial" insofar as it states that "Mr. Harris ran out the front door and into the street in front of their home to attempt to see who had shouted the racial slur." Br. of Appellant at 10. The State concedes that Mr. Harris walked rather than ran out his front door. Br. of Resp't at 21; *see* RP at 127 ("I didn't run out, I just walked out."). The court's finding that Mr. Harris ran out of his home is not supported by the evidence.

Carter challenges findings 1.9 and 1.14 insofar as they state that Mr. Harris's front door was not open to the public and that a gate led to a private sidewalk inside the fenced yard. Those findings state, in relevant part:

---

[2] While Carter assigns error to finding 1.7, his challenge to that finding actually quotes finding 1.9. *See* Br. of Appellant at 10.

> Mr. Harris's front yard is completely fenced. Mr. Harris'[s] mailbox is located across the street and not within their front yard. There is a driveway from the street to their garage. There is an entrance gate adjacent to the home, and inside the gate there is private a sidewalk (within the fenced yard) leading from there to the front porch and their front door.

CP at 16 (Finding of Fact 1.9), and

> The property was not posted with "no trespassing" signs, however the front doorway was not a public area and was not open to the public for the purpose of ringing the doorbell and running away while yelling offensive language which could be heard by persons inside the private residence.

CP at 18 (Finding of Fact 1.14).

Substantial evidence supports finding 1.9. Mr. Harris's front yard is completely fenced, his mailbox is across the street, and a driveway leads from the street to his garage. There is an opening in the fence adjacent to the home for a sidewalk that connects the driveway and the front porch. While the fence opening is not a door, "gate" may be defined as "an opening for passage in an enclosing wall, fence, or barrier." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 939 (1993). We will ascribe that meaning to "gate" in assessing the sufficiency of the evidence. The fact that the sidewalk connecting the driveway to the front porch lay entirely within the Harrises' fenced yard supports the finding that unlike a sidewalk at the front of a lot that lies within a public easement, the Harrises' sidewalk was private, not public.

Finding 1.14 is likewise supported by substantial evidence. Mr. Harris testified that he did not have "No Trespassing" signs posted. The front doorway was well within

8

the boundaries of the Harrises' property, which we have already noted was almost completely fenced, with no opening to a public sidewalk. The court's finding that the front doorway was not impliedly open for the purpose of dingdong ditching and shouting offensive comments is a reasonable inference as to the scope of the implied license to enter a residential yard, which is discussed in greater detail below.

Carter successfully challenges only the finding that Mr. Harris "ran" out of his home following the disturbance.

### B. *Evidentiary support for elements of second degree criminal trespass*

Carter's principal argument on appeal is that the State's evidence did not establish the essential elements of a second degree criminal trespass by Jared and Parker. An accessory may not be convicted in the absence of proof that the one to whom he is charged as accessory actually committed the crime. *State v. Strong*, 167 Wn. App. 206, 211, 272 P.3d 281 (2012) (citing *State v. Nikolich*, 137 Wash. 62, 66-67, 241 P. 664 (1925)).

Due process requires the State to prove every element of the crime charged beyond a reasonable doubt. *State v. Baeza*, 100 Wn.2d 487, 488, 670 P.2d 646 (1983). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d

9

1068 (1992). Where trial was to the bench, this is done through determining whether substantial evidence supports the findings of fact, as discussed earlier, and if so, whether the findings support the conclusions of law. *Homan*, 181 Wn.2d at 105-06. In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *Id.* at 106.

Under RCW 9A.52.080(1), "[a] person is guilty of criminal trespass in the second degree if he or she knowingly enters or remains unlawfully in or upon premises of another under circumstances not constituting criminal trespass in the first degree." "A person 'enters or remains unlawfully' in or upon premises when he or she is not then *licensed*, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(5) (emphasis added).

We begin by noting that the significance Carter attaches to the absence of "No Trespassing" signs at the Harris home is misplaced. Posting is required to exclude persons from only "unimproved and apparently unused land." RCW 9A.52.010(5).[3]

The principal issue at trial was whether Jared and Parker enjoyed a license to enter the Harris property. Among licenses that can prevent an entry from constituting trespass

---

[3] RCW 9A.52.010(5) provides in part that "[a] person who enters or remains upon *unimproved and apparently unused land, which is neither fenced nor otherwise enclosed in a manner designed to exclude intruders*, does so with license and privilege unless notice against trespass is personally communicated to him or her . . . or unless notice is given by posting in a conspicuous manner." (Emphasis added.)

10

are implied licenses. One implied license recognized by common law is a homeowner's implied license to third parties to approach his or her front door for a customary purpose. *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1415, 185 L. Ed. 2d 495 (2013). *Jardines* is a Fourth Amendment search and seizure case, but its outcome depended on the common law issue present here: When does an implied license exist to enter a person's residential property?

In *Jardines*, officers entered into Joelis Jardines's yard with a drug-sniffing dog and, after it alerted at Mr. Jardines's front door, they applied for and obtained a search warrant for his home. Whether the search warrant was valid turned on whether the officers' entry into the yard was "an unlicensed physical intrusion" or, instead, Mr. Jardines "had given his leave (even implicitly)" for the officers to do what they had done. *Id.* at 1415. Justice Scalia summarized the applicable common law:

> "A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee v. Gratz*, 260 U.S. 127, 136, 43 S. Ct. 16, 67 L. Ed. 167 (1922) (Holmes, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626, 71 S. Ct. 920, 95 L. Ed. 1233 (1951). *This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.* Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant *may approach a home and knock, precisely because that is "no more than any private citizen might do." Kentucky v. King*, 563 U.S. [452, 469], 131 S.

11

Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011).

But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. *There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.* To find a visitor knocking on the door is routine (even if sometimes unwelcome); *to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.*

*Id.* at 1415-16 (some emphasis added) (footnotes omitted).

A three-member concurrence in *Jardines* by Justice Kagan explained that she would have decided the case on privacy rather than property grounds. But she offered her own example of limitations on a homeowner's implied license to approach the front door:

A stranger comes to the front door of your home carrying super-high-powered binoculars. . . . He doesn't knock or say hello. Instead, he stands on the porch and uses the binoculars to peer through your windows, into your home's furthest corners. . . . Has your "visitor" trespassed on your property, exceeding the license you have granted to members of the public to, say, drop off the mail or distribute campaign flyers? *Yes, he has.*

*Id.* at 1418 (Kagan, J., concurring) (emphasis added).

Even the dissent, which would not have found the officers' entry into Mr. Jardines's yard to be a trespass, agreed that the implied license to proceed up a walkway to a front door arising from custom has "spatial and temporal" limits. *Id.* at 1422. Among the dissent's examples of limitations on the license are that custom does not give

12

rise to an implied license to veer from the established walkway, "come to the front door in the middle of the night without an express invitation," or linger: "The license is limited to the amount of time it would customarily take to approach the door, pause long enough to see if someone is home, and (if not expressly invited to stay longer), leave." *Id.* at 1422-23 (Alito, J., dissenting).

In the premises liability context, this court has held that a homeowner's implied license to third parties can arise from "local custom." *Singleton v. Jackson*, 85 Wn. App. 835, 839, 935 P.2d 644 (1997) (adopting RESTATEMENT (SECOND) OF TORTS § 330 (1965)). *Singleton* held that a Jehovah's Witness who approached a home for purposes of religious solicitation was a licensee rather than a trespasser, relying on cases from other jurisdictions holding that "strangers approaching a private residence may reasonably interpret the presence of a doorbell or a pathway leading to the door as tacit consent to approach the residence and attempt to contact its occupants." *Id.* at 840-41. Comment e of the *Restatement* is cited by *Singleton* as explaining the rationale underlying the rule. *Id.* at 840. Expanding on "local custom," comment e explains:

> [A]ccount must be taken of customs prevailing in the community. "The well-established usages of a civilized and Christian community" entitle everyone to assume that a possessor of land is willing to permit him to enter for *certain purposes* until a particular possessor expresses unwillingness to admit him. Thus a traveler who is overtaken by a violent storm or who has lost his way, is entitled to assume that there is no objection to his going to a neighboring house for shelter or direction. So too, *if there is a local custom for possessors of land to permit others to enter it for particular purposes, residents in that locality and others knowing of the custom are justified in*

13

> *regarding a particular possessor as conversant with it* and, therefore, in construing his neglect to express his desire not to receive them as a sufficient manifestation of a willingness to admit them. Thus, if it be a custom in a particular town for owners of vacant land to permit persons to cut across it, one doing so is a licensee unless by posted notice or otherwise the particular owner objects to the practice. Familiar intimacy may also justify the assumption of consent to such visits as friends customarily pay to one another.

RESTATEMENT § 330 cmt. e at 174 (emphasis added).

Here, the juvenile court concluded that neither habits of the country nor local custom resulted in the Harrises' impliedly opening their private sidewalk and front porch to third parties for the purpose of dingdong ditching and shouting racist comments through open windows. The conclusion is not only reasonable, it appears inescapable. Carter did not offer evidence that Jared's and Parker's conduct is customary and expected in Yakima County, and therefore implicitly invited by Yakima County homeowners. He does not cite a case from any jurisdiction suggesting that conduct as objectionable as the conduct he solicited and encouraged falls within the scope of a homeowner's common law implied license to third parties. The cases he does cite—search and seizure cases— do not examine the "purpose" limitation on the common law license, nor do they otherwise help him. *See State v. Hoke*, 72 Wn. App. 869, 874, 866 P.2d 670 (1994) (stating that a police officer is permitted the same license to intrude "as a reasonably respectful citizen" and that "[t]he scope of the implied invitation is dependent on the facts and circumstances of each case"); *State v. Ferro*, 64 Wn. App. 181, 183, 824 P.2d 500

14

(1992) (holding that police officers trespassed when they went beyond the defendant's driveway, exceeding any implied license).[4]

Instead, Carter argues that because the court attached importance to the racial slur shouted during the trespass, it "essentially created a new crime by adding a speech element." Br. of Appellant at 17-18. He then identifies three reasons why this new crime cannot be a crime or was not proved: Carter had no notice of the crime; the racial epithet did not constitute a "true" threat or "fighting words" for First Amendment purposes; and there is insufficient evidence the epithet was shouted while Jared was on the Harrises' property. *Id.* at 24-26.

The court did not create a new crime. The "habits of the country/local custom" limitation on a homeowner's implied license is well settled. The racist comment shouted by Jared was relevant to that limitation. There being no "new crime," notice is not an issue.

For the same reason—that the racist comment was merely evidence relevant to

---

[4] Carter argues on appeal that he asserted the defense provided by RCW 9A.52.090(2) (compliance with conditions of premises open to the public). The defense negates the unlawful entry element of the crime, so "once a defendant has offered some evidence that his or her entry was permissible under RCW 9A.52.090, the State bears the burden to prove beyond a reasonable doubt that the defendant lacked license to enter." *City of Bremerton v. Widell*, 146 Wn.2d 561, 570, 51 P.3d 733 (2002). Carter does not identify any basis on which the Harris property was "open" other than the common law implied license, so his assertion of the defense adds nothing to the State's burden of proving that Jared's and Parker's presence was unlawful.

limitations on the implied license—the First Amendment is a nonissue. "'[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Cox v. Louisiana*, 379 U.S. 559, 563, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S. Ct. 684, 93 L. Ed. 834 (1949)). "Although the First Amendment broadly protects 'speech,' it does not protect the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 420, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (Stevens, J., concurring) (alteration in original) (quoting Frederick Schauer, *Categories and the First Amendment: A Play in Three Acts*, 34 VAND. L. REV. 265, 270 (1981)). Carter was found guilty not because of what Jared said, but because the conduct that Carter solicited and encouraged took place on the Harrises' front porch, where Jared and Parker had no lawful right to be.

Finally, the trial court found that the racial slur was shouted while Jared was standing on the Harris porch. CP at 16 (Finding of Fact 1.9). Carter has not assigned error to that part of finding 1.9, which is a verity on appeal. *State v. B.J.S.*, 140 Wn. App. 91, 97, 169 P.3d 34 (2007).

The trial court found the facts to be as testified to by Mr. and Ms. Harris and Parker. It found their testimony to be supported by the Harrises' surveillance video. It

16

found evidence of consciousness of guilt in Jared's and Parker's running away following the trespass. It found Carter's central involvement to be supported by Parker's testimony and circumstantially by uncontroverted evidence of the statement made by Carter's mother, suggesting Carter comes from a household harboring racist attitudes. Its findings support its conclusions that Carter knowingly solicited, encouraged or requested the trespass; that Jared's and Parker's entry onto the Harris property was for an unlicensed purpose; and its ultimate conclusion that Carter was guilty of second degree criminal trespass as an accomplice.

## II. Recusal

Carter's remaining assignment of error is to Judge Federspiel's refusal to recuse himself, which he argues violated due process and the appearance of fairness doctrine.[5] He contends on appeal that he "presented evidence of potential, if not actual, bias" on the part of the judge. Br. of Appellant at 29. We review a trial court's recusal decision for an abuse of discretion. *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 840, 14 P.3d 877 (2000). The trial court abuses its discretion when its decision is

---

[5] He also relies indirectly on former Canon 3(D)(1) (2002) of the Code of Judicial Conduct (CJC) in citing *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000). Br. of Appellant at 27. But as a result of the wholesale revision of the CJC in 2010, the version of the CJC in effect when *Wolfkill*'s recusal issue arose was rescinded.

manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Most matters relating to judicial disqualification do not rise to a constitutional level, and personal bias or prejudice alone is not a sufficient basis for imposing a constitutional requirement under the due process clause. *Tatham v. Rogers*, 170 Wn. App. 76, 92, 283 P.3d 583 (2012) (citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009)). "[S]tate codes of judicial conduct provide more protection than due process requires, and . . . 'most disputes over disqualification will be resolved without resort to the Constitution.'" *Id.* (quoting *Caperton*, 556 U.S. at 890).

The Washington Supreme Court has characterized a judge's failure to recuse himself or herself when required to do so by the judicial canons as a violation of the appearance of fairness doctrine, and has narrowed the scope of the appearance of fairness doctrine in the context of judicial decision making to whether there is evidence of a judge's or decision maker's actual or potential bias. *Id.* at 94 (citing *State v. Post*, 118 Wn.2d 596, 619 n.9, 826 P.2d 172, 837 P.2d 599 (1992)). Before the appearance of fairness doctrine will be applied, there must be evidence of a judge's actual or potential bias. *State v. Dominguez*, 81 Wn. App. 325, 329, 914 P.2d 141 (1996). If a party presents sufficient evidence of bias, "[t]he test is whether a reasonably prudent and disinterested observer would conclude [the party] obtained a fair, impartial, and neutral

18

trial." *Id.* at 330.

In this case, Carter's only evidence of potential bias is the several statements made by the judge at the hearing on the motion to compel diversion. Judge Federspiel responded to the recusal motion with oral and written decisions identifying the context of his statements.

Responding to Carter's complaint that he described the case as an "emotional case," Judge Federspiel explained that by the time of the hearing, he had reviewed the court file. It revealed that Carter's alleged solicitation of his friends' trespass was the culmination of other unpleasantness between Carter, Mr. Harris, and Mr. Harris's daughter. As Judge Federspiel explained,

> [K]eep in mind that the documents on file in this case contain allegations
> that the alleged victims' daughter questioned the respondent's actions in
> calling another student a "faggot"; that in response the respondent
> commented on Facebook that she was "[a] once a month bleeding bitch;"
> that there was a period of exchanges over time with less than civilized
> accusations back and forth, culminating in the alleged statement yelled on
> Mr. Harris' porch: "You fucking Nigger, Go back to Africa!"
>     It would be disingenuous of me, or any judge for that matter, to
> convey that this case does not have the potential to stir the emotions of
> many segments of our society.

CP at 85.

The judge's reference to the case being an emotional one was in the context of the prosecutor's request that the judge exercise his supervisory power over the diversionary unit to recommend against diversion. Essentially, the prosecutor was asking the judge to

decide, based on material in the court file, that the allegations of wrongdoing by Carter were too serious to qualify for a diversion agreement. Judge Federspiel's comment about the case being emotional was a response to this appeal, and was immediately followed by his statement that "just because cases are emotional it does not allow you to bypass the law." RP at 51. In this context, the judge's comment merely acknowledged what the prosecutor had said in objecting to diversion: that the *allegations* reflected in the file were not of "a mere technical property violation, but a racially motivated and hateful intrusion into a family's home." CP at 194.

The comment "Do I like it? No," addressed the fact that Judge Federspiel does not favor the legislative decision to repose the decision whether to enter into a diversion agreement exclusively in the diversionary unit. Here, too, the judge immediately added, "But I am bound to follow the law of the legislature"—which he thereafter did, ordering the State to refer the case to the diversionary unit. RP at 52. Objectively viewed, the judge was being candid about his attitude toward the law while at the same time assuring the parties that he intended to follow it.

Finally, Judge Federspiel explained to Mr. Harris that he did not "have the ability to bypass the governor or the legislature in terms of this law no matter what my personal feelings are, or what I think the equities are." RP at 54. If this conveyed anything about how the judge would conduct the trial, it was that regardless of any sympathy he might have for Mr. Harris he would follow the law.

20

Judge Federspiel's comments in the pretrial hearing, although expressed before the presentation of all the evidence, addressed only what he knew about the charges at that time; how the trial participants might expect that knowledge to affect him; and the fact that whatever the effect, he was reserving judgment and would follow the law. His candid comments were not unreasonably made given the context in which they *were* made, and were accompanied by words and conduct demonstrating impartiality. He did not abuse his discretion in denying the recusal motion.

Affirmed.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.

21