IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

            Respondent,

      v.

PETER LANUM TREVIGNE,

            Appellant.

No. 84222-6-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, A.C.J. — Peter Trevigne appeals from his conviction for one count of assault of a child in the first degree—domestic violence against his three-month-old child, X, as well as the special verdicts that X was a particularly vulnerable victim and Trevigne abused his position of trust in the commission of the crime. He seeks reversal on the grounds that he was "surprised" at trial by evidence of his text messages, his constitutional right to an impartial jury was violated, and he received ineffective assistance of counsel. We disagree and affirm. However, remand is required for the trial court to strike certain legal financial obligations from Trevigne's judgment and sentence, and to consider whether to impose interest on restitution pursuant to RCW 10.82.090(2).

FACTS[1]

On August 14, 2018, the State charged Peter Trevigne with one count of assault of a child in the first degree, alleged as a crime of domestic violence, based

---

[1] Additional facts will be set out in each section as necessary for analysis of the various assignments of error.

on an incident involving his then three-month-old son, X. Thereafter, the State filed an amended information and added special allegations that X was a particularly vulnerable victim and Trevigne abused a position of trust. The charges stemmed from serious brain injuries that X suffered while in the sole care of Trevigne on August 9, 2018. When X arrived at the hospital, initial CT[2] scans showed brain swelling and subdural hematomas on both sides of X's brain.

The case proceeded to trial and the State offered testimony from numerous physicians and medical experts who treated and observed X, all of whom concluded that the injuries were consistent with nonaccidental trauma and abusive head trauma. Trevigne took the stand in his own defense and testified that he was walking around the apartment rocking X, when all of a sudden "[X] just jolt[ed] and g[ot] real stiff." According to Trevigne, X remained stiff and turned bright red for five to ten seconds before "snap[ping] out of it." Then, Trevigne stated, X had a "wet dry heave" and "his eyes close[d] and he [went] limp." Angela Setlak, X's mother and Trevigne's former partner, also testified.

The jury found Trevigne guilty as charged and further found the State had proved each special allegation beyond a reasonable doubt. After the verdict, Trevigne moved for a new trial, but the judge denied the motion and imposed an exceptional sentence above the standard range of 150 months confinement. The court also imposed the $500 victim penalty assessment (VPA) and $100 DNA collection fee as legal financial obligations, as well as $5,000 in restitution, with an

---

[2] Computed tomography.

order that the restitution award would accrue interest in accordance with a statute in effect at the time of sentencing.

Trevigne timely appealed.

ANALYSIS

I.      Claim of Juror Bias

Trevigne first assigns error to the trial court's denial of his challenge for cause against juror 122 who, according to Trevigne, exhibited actual bias.

As the trial court weighs the credibility of a challenged juror and is in the best position to observe them, we give "substantial deference to the trial court's decision of whether the juror is actually biased such that dismissal is appropriate." *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 806-07, 425 P.3d 807 (2018). "A trial court abuses its discretion if its decision is 'manifestly unreasonable or based on untenable grounds.'" *Id.* at 807 (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.,* 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)). The denial of a challenge for cause "will not constitute reversible error absent a manifest abuse of that discretion." *State v. Noltie*, 116 Wn.2d 831, 838, 809 P.2d 190 (1991).

The right to a fair and impartial jury is guaranteed to all criminal defendants by our state and federal constitutions. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. To protect this constitutional right, a party may seek to excuse a juror by challenging them for cause. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 855, 456 P.3d 869 (2020); CrR 6.4(c)(1). One of the particular grounds for such a challenge is "actual bias," which is defined as "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the

court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). To sustain a challenge based on actual bias, "the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190.

Before jury selection began on August 19, 2022, the potential jurors filled out written questionnaires and answered questions on their ability to serve. The State notes in briefing that the instructions of the court for jurors completing the questionnaire do not appear in the record from the trial court, but instructions on a questionnaire proposed by Trevigne expressly directed participants to "please answer 'yes' to any question where you believe your response would be 'yes' *or 'maybe.'*"[3] (Emphasis added.) Juror 122 answered "Yes" to the question, "Is there any reason that you would be unable to be fair and impartial to both sides in a case involving an accusation of assault of an infant?" In explanation of her response to that question, juror 122 wrote, "Maybe. I'm a mother and would have [a] hard time understanding why someone would do that." Juror 122 later answered "No" to the question, "Do you have any concerns for any reason about your ability to be a fair and impartial juror in this case?"

During questioning of the prospective jurors, juror 122 and eight others raised their hands when defense counsel asked the panel if they thought "you

---

[3] On the proposed questionnaire from the defense, there is a preprinted line immediately following question seven about reasons a juror might be unable to try the case fairly or impartially. The line reads, "If yes or maybe, please explain briefly," followed by four blank lines for the juror's response.

know, this is not for me. I really can't just set aside everything and sort of be this idealized version of impartiality." When asked to explain, juror 122 stated:

> I mean, similar to what a couple of the other jurors have said. I mean, we've all been there with small children, but there's a million options besides shaking them and hurting them and it just has long-term impacts and *I think I'd like to think I could be unbiased, but I'm not sure I could when it comes to abuse of a small child*.

(Emphasis added.) Trevigne challenged juror 122 for cause and the trial court denied the challenge. Trevigne exhausted his peremptory challenges on other jurors and juror 122 was seated and deliberated.

On appeal, Trevigne points to juror 122 stating, "I think I'd like to think I could be unbiased, but I'm not sure I could when it comes to abuse of a small child," as establishing actual bias. However, "equivocal answers alone do not require a juror to be removed when challenged for cause, rather, the question is whether a juror with preconceived ideas can set them aside." *Noltie*, 116 Wn.2d at 839. Actual bias must be "established by proof" and "the record must demonstrate 'that there was a probability of actual bias.'" *Sassen Van Elsloo*, 191 Wn.2d at 808-09 (quoting *Noltie*, 116 Wn.2d at 838-39). The single statement identified by Trevigne is equivocal and insufficient by itself to constitute actual bias.

Trevigne relies on *Guevara Diaz* as support for his argument on this issue. In that case, the juror answered "No" in a questionnaire asking whether she could be fair to both sides in a sexual assault trial, the trial court did not allow defense counsel to question her outside the presence of the jury, and neither the court nor the defense asked her any questions during voir dire. 11 Wn. App. 2d at 846-47. The only question the juror was asked individually was whether "she could follow

the judge's instruction in reviewing the evidence even if she did not want someone to be punished." *Id.* at 857. She responded, "I would be able to. No compromising." *Id.* This court held that "she exhibited actual bias" as "[a]ll that the record clearly shows is that juror 23 said she could not be fair." *Id.* at 858.

Here, unlike the limited exchanges in *Guevara Diaz*, the record shows multiple responses from juror 122, both written and verbal, that do not indicate an inability to be fair and impartial. Although juror 122 answered "Yes" to whether there was "any reason that [she] would be unable to be fair and impartial to both sides," she clarified her answer with: "Maybe. I'm a mother and would have [a] hard time understanding why someone would do that." Moreover, juror 122 later answered "No" when specifically asked if she had "any concerns for any reason about [her] ability to be a fair and impartial juror in this case." While her answer during voir dire showed some equivocation, that is not enough to show actual bias. *Noltie*, 116 Wn.2d at 839. Here, the record does not establish that juror 122 had a probability of actual bias and, thus, the trial court did not abuse its discretion in denying the defense challenge for cause. *See Sassen Van Elsloo*, 191 Wn.2d at 808-09.

II. Defense Motion for New Trial

Trevigne avers the trial court erred in denying his motion for a new trial "based on surprise and irregularity."[4] We disagree.

---

[4] On appeal, Trevigne points to two distinct provisions in support of his contention that the trial court erred denying his motion for a new trial: CrR 7.5(a)(4), "Accident or surprise," and CrR 7.5(a)(5), "Irregularity in the proceedings of the court, jury or prosecution, or any order of court, or abuse of discretion, by which the defendant was prevented from having a fair trial." However, Trevigne did not raise CrR 7.5(a)(5) in his motion for a new trial. Moreover, he makes no attempt

A.      Facts from Trial

Trial commenced on April 25, 2022, and the parties delivered opening statements.  The State's second witness, Detective Jayme Beecroft of the Seattle Police Department (SPD), was set to testify the following day.  In preparing for Beecroft's testimony, both defense counsel and the deputy prosecutor realized that they had not received Beecroft's report on certain evidence of text messages extracted from Trevigne's laptop, which she had referenced during her defense interview in October 2020.  The following morning, defense counsel raised the issue to the trial judge and asserted that it was a violation of the State's obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  In response, the prosecutor said that he reached out to Beecroft that morning and requested her report.  He further advised that Beecroft e-mailed him the data extracted from the laptop, which the prosecutor forwarded to the defense "within minutes."  The judge noted that the failure to timely disclose the data from the laptop "was at least a violation of [CrR] 4.7" and explained that Beecroft may need to be brought back to testify on cross-examination depending on what evidence had been discovered in the search of the laptop.  At the conclusion of testimony

---

to meet RAP 2.5(a)'s requirement of demonstrating a "manifest error affecting a constitutional right" in order to raise this argument for the first time on appeal.

"A party may not generally raise a new argument on appeal that the party did not present to the trial court."  *State v. Lazcano*, 188 Wn. App. 338, 355, 354 P.3d 233 (2015).  Rather, the party "must inform the [trial] court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error."  *Id.*  Because Trevigne did not raise any argument under CrR 7.5(a)(5) in the trial court and does not address RAP 2.5, we do not consider this argument.  Moreover, even if Trevigne could raise this new basis for the first time on appeal, this court "will not review issues for which inadequate argument is briefed or only passing treatment is given."  *State v. C.B.,* 195 Wn. App. 528, 535, 380 P.3d 626 (2016).  As Trevigne neither provides separate analysis under CrR 7.5(a)(5) nor expressly identifies any specific "irregularity" that allegedly deprived him of a fair trial, this issue is inadequately briefed and does not warrant consideration.

that day, the State turned over a drive that contained a detective's analysis of the laptop data.

The next day, April 27, Trevigne moved for a mistrial based on the late disclosure of the data from his laptop. The data purportedly contained a total of 137,624 text messages exchanged between Trevigne and other contacts, including Setlak, and defense counsel voiced concerns about having time to review those messages while also preparing for cross-examination of Setlak and other of the State's witnesses. The prosecutor explained that he was not going to seek admission of any evidence from the laptop but rather intended to move to admit and publish the text messages between Setlak and Trevigne that were exchanged on August 9 and 10, 2018, which came from the extraction of Setlak's cell phone. The evidence from Setlak's cell phone had been provided to Trevigne during discovery in a Cellebrite[5] report, but the court acknowledged the potential that there could be impeachment evidence from Trevigne's laptop and thus required that Setlak be made available for possible recall on cross-examination. The judge denied the motion for a mistrial.[6]

On April 28, after having reviewed the messages from Trevigne's laptop that included communication with Setlak, the prosecutor stated that the defense "had every message from [] Setlak's phone dating back to July of 2017, which includes every message from [] Setlak and [] Trevigne." Thus, the prosecutor asserted, "there was nothing new" between Setlak and Trevigne that came from the laptop.

---

[5] "Cellebrite" is a digital forensics tool used by law enforcement to extract data from cell phones.

[6] Trevigne does not challenge this ruling on appeal.

In response, defense counsel contended, incorrectly, that the Cellebrite report she had received in discovery only included text messages between Setlak and Trevigne "from August 3rd to August 10th or 13th[, 2018]."

On May 2, Trevigne filed a motion to dismiss pursuant to CrR 8.3(b) for alleged violations of *Brady* and CrR 4.7 based on the late disclosure of the data extracted from Trevigne's laptop. In the motion, defense counsel described the contents of the text messages from the laptop and referenced photos and text messages exchanged between Trevigne and his friend, Kristen Austen, as well as others. Defense counsel also described the text messages between Trevigne and Setlak as follows:

> [T]he laptop analysis contains thousands of text messages between [] Trevigne and [] Setlak over the course of 10 months leading up to the incident. Many of these text messages are further evidence that [] Trevigne lacked the intent to harm [X]. The text messages also show that [] Setlak used similar derogatory language as [] Trevigne when referring to [X], such as calling him "little fucker," a nickname she created for [X] when he was still in utero.

Trevigne argued that the laptop analysis contained *Brady* evidence that was favorable to the defense, including impeachment evidence against Setlak,[7] and therefore, the State's "failure to disclose" the evidence deprived him of his right to a fair trial.

The State filed a response and pointed out again that all of the messages between Setlak and Trevigne that were obtained from his laptop were also included in the Cellebrite report from Setlak's cell phone, which was turned over to

---

[7] Trevigne did not recall Setlak for additional cross-examination.

the defense in discovery on January 28, 2020. After hearing argument from the parties, the trial court denied the motion to dismiss.[8]

On May 10, after both defense experts testified, Trevigne's counsel sought a half-day recess for the following day in order to discuss the laptop materials with Trevigne and determine whether he would testify. The judge denied the half-day recess but agreed to resume trial later than usual, at 10:30 a.m. After this consultation with counsel, Trevigne advised the court that he would testify and seek to admit two exhibits derived from his laptop, text messages from Setlak referring to X as "little fucker" and text messages exchanged with Austen.

On May 11, two weeks after receiving all of his own text messages that were derived from the analysis of his laptop, Trevigne took the stand to testify. He explained that he had not slept the night before the August 9, 2018 incident and was unable to sleep the next day due to X's behavior. Trevigne denied being frustrated with X for keeping him awake and testified that it was "nothing [he] couldn't handle." When defense counsel asked him about the numerous text messages he had sent to Setlak on August 9, including a message that read, "This isn't a good idea; can I murder [X], please?", Trevigne asserted that he had only "mimicked the text messages" that Setlak had sent him when she took X to the ER on July 26, 2018. According to Trevigne, when Setlak was at the ER with X on that date, she messaged him saying, "I am going to kill him" or "Can I kill him?" On cross-examination, however, Trevigne admitted that there was no text message from Setlak between July 24 and 26 where she said any such thing. Trevigne was

---

[8] Trevigne does not appeal this ruling.

also impeached with text messages that contradicted his testimony about the reasons behind his breakup with Setlak and his complaints to friends about Setlak and X.

On May 26, 2022, Trevigne filed a motion for a new trial and argued that his "right to a fair trial was materially affected by surprise at trial." Trevigne claimed that the State "withheld evidence" of his own text messages with Setlak and that he "became aware of the existence of these text messages just two days prior to his testimony." According to Trevigne, he was "prejudiced when he was confronted for the first time on the stand with text messages he had not seen for over three years." At the hearing on the motion for a new trial, defense counsel stated, "[T]here is no case, one way or the other, that describes what in fact is a surprise when it comes up at trial, but I do think that this squarely falls into that situation."

In response, the State emphasized that "the evidence the defense is claiming to be surprised by are the defendant's own statements." The State reasoned that there was no "surprise" because it was "[Trevigne's] own prior inconsistent statements" that "were used as impeachment evidence in cross-examination." The State noted that the text messages were not presented in its case in chief and it was Trevigne who "took the stand and chose to testify about prior text message conversations," which were "brief conversations from three select dates in the month of July [2018]." The State explained that Trevigne "opened himself up to cross-examination of those text conversations because he testified wildly inconsistently with what those text conversations actually were" and other "messages that he claimed that were exchanged just didn't exist." Notably,

the State also highlighted that the "defense did have access to these messages in discovery" but "chose not to inspect every file contained within discovery."

After hearing from the parties, the trial court denied the motion for a new trial:

> I understand the defense's point that had the defense had this information—clearly had this information—it could have—two points; one, [] Trevigne arguably could have made a decision not to testify, or alternatively his testimony could have addressed these issues without ameliorating any sense of impeachment or surprise.
> That said I think the evidence would have come out anyway.
> The defense—and I also understand the defense position with respect to access to the information, but the—and the technical issues regarding—which I don't fully understand, but I do accept the fact that technically it was not easily readable to a layperson, but the defense could have retained someone to get into this information and the defense does do that in other kinds of cases—experts, computer-type experts—programmers, coders—and that is something the defense didn't do, so the amount of surprise I think is less than the defense is presenting here, or at least less than the court should take into consideration.
> While the issue of the use of the word murder and the use of the F-word was certainly not entirely a surprise, and I think it was clear—the court—the parties made it clear to the jury that these were not aggressive terms, they were not intended aggressively, they were odd—odd terms of what I would call potentially terms of endearment and not anything vicious or ugly.
> I am satisfied that the defendant got a fair trial; it was mostly a credibility issue. I am going to deny the motion for a new trial.

B.     Analysis Under CrR 7.5

CrR 7.5(a) provides that the trial court may grant a defendant's motion for a new trial when "it affirmatively appears that a substantial right of the defendant was materially affected" by any one of eight enumerated causes. At issue here is CrR 7.5(a)(4), "Accident or surprise."[9]

---

[9] Although Trevigne's motion for a new trial also sought relief under CrR 7.5(a)(6), "Error of law occurring at the trial and objected to at the time by the defendant," and CrR 7.5(a)(8), "That

A new trial is required "only when the defendant 'has been so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly.'" *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997) (quoting *State v. Russell,* 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).  Whether to grant or deny a motion for a new trial is "within the discretion of the trial court, and the decision will not be disturbed unless there is a clear abuse of discretion."  *State v. Hager*, 171 Wn.2d 151, 156, 248 P.3d 512 (2011).  Such an abuse of discretion exists "'only when no reasonable judge would have reached the same conclusion.'"  *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (internal quotation marks omitted) (quoting *Bourgeois*, 133 Wn.2d at 406).

Trevigne relies on *State v. Townsend*, 7 Wash. 462, 35 P. 367 (1893), for the contention that "surprise" warrants a new trial here.  Townsend was convicted of assault with a deadly weapon and the judge denied his motion for a new trial.  *Townsend,* 7 Wash. at 466.  In support of that motion, defense counsel submitted an affidavit, which was undisputed and provided that "the prosecuting attorney, in open session of the court, and in the presence of divers and sundry persons, stated to the court that he did not intend to further prosecute the defendant, John Port Townsend, and that said cause would be dismissed."  *Id.*  The prosecutor's statement was communicated to Townsend who, in reliance on the statement, failed to raise money or correspond with defense counsel as to the "necessity of procuring witnesses to testify" on his behalf.  *Id.*  On review, the court stated that the prosecutor's statement "would be almost certain to mislead the defendant and

---

substantial justice has not been done," he does not present argument on appeal on those alternate bases.

his attorneys, and cause them to cease their preparations for defense." *Id.* at 467. As to prejudice, the court explained that the materiality of the testimony of one of the witnesses identified in the affidavit "cannot be disputed" and if that witness "would testify to the state of things which the affidavit states he will, that the result of the trial would probably be different." *Id.* at 467-68. Thus, the court reversed and remanded for a new trial. *Id.* at 468.

Ignoring the fact that *Townsend* is over 130 years old and includes problematic reasoning based on colonial and discriminatory perspectives of Native Americans, the holding is easily distinguished. Trevigne points to the defense interview of SPD Sergeant Darin Sugai on August 5, 2020, which addressed the Cellebrite report of Setlak's phone, and alleges that Sugai incorrectly assured the defense that the evidence extracted "did not contain any messages outside the eight-day window between August 3 and August 10, 2018." Even if this characterization captured the entirety of the information conveyed by Sugai, it would hardly be comparable to the prosecutor in *Townsend* stating in open court that the charges are going to be dismissed. When asked about a particular folder in the Cellebrite data, Sugai told defense counsel that he was "assuming that [the folder labeled] logical 01 is a raw data file" but explained that he had not looked at it. More critically though, the court in *Townsend* determined a new trial was appropriate as the presence of a key witness with material testimony had not been procured for trial in reliance on the prosecutor's statement that he was dismissing the case, whereas the evidence here was Trevigne's own text messages with Setlak that were not exculpatory and had been turned over to the defense in

- 14 -

discovery, albeit from a difference source. Even if the messages were not recognized at the time of their initial disclosure in the Cellebrite data from Setlak's phone, the record clearly establishes that they were reviewed prior to Trevigne's testimony as defense counsel described their contents in the motion to dismiss filed nine days before Trevigne took the stand. The procedural history and record of this case establishes that the content of the messages was not a surprise under CrR 7.5(a)(4). Trevigne's impeachment with his own text messages, which had been turned over in discovery nearly two years before trial and examined by defense counsel closely enough to have been cited and discussed in an earlier motion, did not result in such prejudice that would require a new trial. The trial court did not abuse its discretion in denying Trevigne's CrR 7.5 motion. *See Bourgeois*, 133 Wn.2d at 406.

III.    Ineffective Assistance of Counsel

Trevigne argues in the alternative that if the State's discovery violations do not warrant a new trial, then defense counsel was ineffective for failing to adequately investigate the laptop and cell phone data.

The Sixth Amendment to the United States Constitution and article I, section 22 of our state constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To succeed on a claim of ineffective assistance of counsel, the defendant must satisfy the two-part *Strickland* test, which requires a showing of deficient performance and resulting prejudice. 466 U.S. at 687. Specifically, the defendant must show that

(1) defense counsel's representation was deficient, *i.e.,* it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.,* there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. McFarland,* 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "If either element of the test is not satisfied, the inquiry ends." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

The burden is on the defendant to establish deficient performance. *Grier*, 171 Wn.2d at 33. To meet this burden, the defendant must overcome "a strong presumption that counsel's performance was reasonable." *Kyllo*, 166 Wn.2d at 862; *see also In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017) ("[O]ur scrutiny of counsel's performance is highly deferential and we strongly presume reasonableness."). "Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *McFarland*, 127 Wn.2d at 336.

The presumption of reasonable performance can be overcome by showing that counsel failed to conduct appropriate investigation. *State v. Thomas*, 109 Wn.2d 222, 230, 743 P.2d 816 (1987); *State v. Maurice*, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). To be effective, "'counsel must, at a minimum, *conduct a reasonable investigation* enabling counsel to make informed decisions about how best to represent the client.'" *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001) (quoting *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994)).

Trevigne cites to *Thomas*, *Maurice,* and *Brett* in briefing, but offers no analysis of those cases and fails to even apply the first prong of the *Strickland* test to the alleged deficient conduct at issue. Rather, Trevigne expressly "maintains the State, not defense counsel, is to blame," and then summarily asserts that "if this court concludes otherwise, then defense counsel was deficient for failing to obtain and review the contents of the laptop and cell phone extraction." This conclusory statement is plainly insufficient to overcome the strong presumption that defense counsel's performance was reasonable *considering all of the circumstances*.[10]

The three cases Trevigne relies on involved defense counsel who completely failed to investigate pivotal issues of their cases. *See Thomas*, 109 Wn.2d at 229-31 (finding defense counsel made "no investigation" into qualifications of only witness called as expert and witness was clearly unqualified to offer expert testimony); *Maurice*, 79 Wn. App. at 550-52 (noting defendant charged with vehicular homicide insisted mechanical malfunction made him lose control of vehicle but defense counsel did not investigate claim and failed to even have vehicle inspected by mechanic before trial); *Brett,* 142 Wn.2d at 880-81 (finding defense counsel in capital case had reason to know of defendant's mental and physical disabilities but failed to conduct investigation into those issues and only expert sought by counsel to evaluate defendant was "wholly unqualified to render a medical diagnosis"). Trevigne fails to provide any analysis in briefing to

---

[10] "'Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *State v. Collins*, 152 Wn. App. 429, 440 n.27, 216 P.3d 463 (2009) (quoting *Palmer v. Jensen,* 81 Wn. App. 148, 153, 913 P.2d 413 (1996)).

demonstrate factual similarity between these cases and his own. Because Trevigne has not carried his burden to establish deficient performance under *Strickland*, we need not reach prejudice. *Kyllo*, 166 Wn.2d at 862.

IV.    Victim Penalty Assessment and DNA Collection Fee

Trevigne next argues the trial court erred in imposing the $500 VPA and $100 DNA collection fee and requests this court to remand for the trial court to strike both from his judgment and sentence. The State does not oppose remand to strike the VPA and DNA fee.

After Trevigne's sentencing in June 2022, the legislature amended RCW 7.68.035 to restrict trial courts from imposing the VPA "if the court finds that the defendant, at the time of sentencing, is indigent." RCW 7.68.035(4); LAWS OF 2023, ch. 449, § 1. Trevigne is indigent and the State does not contest this. While no express finding of indigency was made at the time of sentencing, it is clear from the court's order authorizing Trevigne's appeal to proceed in forma pauperis and the fact that it only imposed the VPA and DNA fee, both of which were mandatory regardless of indigency at the time, that the court considered him indigent.

Although the statutory amendment that added subsection RCW 7.68.035(4) took effect on July 1, 2023, after Trevigne was sentenced, it nonetheless applies to Trevigne because his case is on direct appeal. *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) (citing *State v. Ramirez,* 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018)). Similarly, the legislature amended RCW 43.43.7541 and that statute no longer requires defendants to pay a DNA collection fee. LAWS OF 2023, ch. 449, § 4. This amendment also applies to Trevigne. *See Ellis*, 27 Wn. App.

2d at 17. Accordingly, we remand for the trial court to strike both the VPA and DNA collection fee from the judgment and sentence.

V.      Interest on Restitution

Based on another statutory amendment, Trevigne argues the trial court erred by failing to exercise its discretion when imposing interest on the restitution award.

The statute in effect at the time of Trevigne's sentencing provided that "restitution imposed in a judgment shall bear interest from the date of the judgment until payment, at the rate applicable to civil judgments." Former RCW 10.82.090(1) (2018). As the trial court ordered Trevigne to pay $5,000 in restitution to Setlak, the judgment and sentence provides that amount will bear interest pursuant to the former RCW 10.82.090.

After Trevigne was sentenced, the legislature amended RCW 10.82.090 and the new provision provides that the trial court "may elect not to impose interest on any restitution the court orders." RCW 10.82.090(2); LAWS OF 2022, ch. 260, § 12. Before a trial court determines whether to impose interest on restitution, it must now consider the following factors:

> (a) Whether the offender is indigent as defined in RCW 10.01.160(3) or general rule 34; (b) the offender's available funds, as defined in RCW 10.101.010(2), and other liabilities including child support and other legal financial obligations; (c) whether the offender is homeless; and (d) whether the offender is mentally ill, as defined in RCW 71.24.025. The court shall also consider the victim's input, if any, as it relates to any financial hardship caused to the victim if interest is not imposed. The court may also consider any other information that the court believes, in the interest of justice, relates to not imposing interest on restitution. After consideration of these factors, the court may waive the imposition of restitution interest.

RCW 10.82.090(2).

- 19 -

Though this amendment did not come into effect until after Trevigne's sentencing, it applies now because his case is on direct appeal. *Ellis*, 27 Wn. App. 2d at 16 (citing *Ramirez*, 191 Wn.2d at 748-49).

Unpersuasively, the State avers that "*Ellis* was wrong to rely on *Ramirez*" and insists that this court "should not make the same mistake." This division has already considered and rejected the State's contention on this precise issue, that *Ellis* was wrongly decided. *See State v. Reed*, 28 Wn. App. 2d 779, 538 P.3d 946 (2023). In *Reed*, this court explained that "[l]ike the costs imposed in *Ramirez*, restitution interest is a financial obligation imposed on a criminal defendant as a result of a conviction." *Id.* at 782. The court expressly "agree[d] with *Ellis* that restitution interest is analogous to costs for purposes of applying the rule that new statutory mandates apply in cases, like this one, that are on direct appeal." *Id.* In line with *Ellis*, this court explained that "though the amendment to RCW 10.82.090 regarding the superior court's authority to waive interest on restitution did not take effect until after Reed's resentencing, it applies here because this case is on direct appeal." *Id.*

Following the sound reasoning of *Ellis* and *Reed*, on remand the trial court must also determine whether to impose interest on restitution pursuant to RCW 10.82.090(2).

Affirmed in part, reversed in part, and remanded.

WE CONCUR:

Hazelrigg, A.C.J.

Chung, J.

Smith, C.J.